UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                      :

JUAN B. PUJOL MOREIRA, in his personal capacity   :
and as Personal Representative and Administrator of the  :
ESTATE OF NIEVES PUJOL a/k/a NIEVES MOREIRA  :
MARTINEZ et al.,                               :           20-CV-9380 (JMF)
                                        :
                  Plaintiffs,          :         OPINION AND ORDER
                                        :
              -v-                      :
                                        :
SOCIÉTÉ GÉNÉRALE, S.A. et al.,           :
                                        :
                  Defendants.       :
                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

      This case is one of the first brought in this District under the Cuban Liberty and

Democratic Solidarity Act of 1996, 22 U.S.C. § 6021, *et seq*., commonly known as the Helms-

Burton Act (the "Act" or the "Helms-Burton Act"), which creates a private cause of action

against those who "traffic" in assets that were confiscated by the Cuban government.  Although

the Act went into effect in 1996, the right to bring a cause of action under it was suspended by

presidential decree until May 2019, when President Trump lifted the suspension for the first

time.  Shortly thereafter, Plaintiffs — heirs of the former owners of Banco Pujol, a Cuban bank

confiscated by the Cuban government in 1960 — brought this suit, alleging that Defendants

Société Générale ("SG") and BNP Paribas ("Paribas"), both multinational banks, "trafficked" in

their confiscated assets by arranging credit facilities for Banco National de Cuba ("BNC"), the

Cuban national bank that absorbed Banco Pujol's confiscated assets.

      Defendants now move, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of

Civil Procedure, to dismiss Plaintiffs' claims.  They raise various arguments, including that

Plaintiffs lack standing under Article III of the Constitution and that Plaintiffs' claims are time barred by the Act, which provides that an action "may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur."  22 U.S.C. § 6084.  For the reasons that follow, the Court concludes that Plaintiffs do have constitutional standing but that their claims are indeed time barred.  Accordingly, the Court grants Defendants' motion to dismiss the Complaint for failure to state a claim, albeit with leave to amend.

## BACKGROUND

The Court begins with the relevant background, starting with the Helms-Burton Act and then turning to the facts specific to this case.  The latter are drawn from the Amended Complaint ("Complaint"), ECF No. 29 ("Compl.") and assumed to be true for purposes of this motion.  *See, e.g.*, *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015).

### A.  The Helms-Burton Act

In 1996, seeking to strengthen the United States' economic sanctions on Cuba and hasten the end of the Fidel Castro regime, Congress passed the Helms-Burton Act.  Congress observed that Cuba was "offering foreign investors the opportunity to purchase an equity interest in, manage, or enter into joint ventures," oftentimes using property confiscated from United States nationals, and that these foreign investors were, in turn, providing Cuba with "badly needed financial benefit, including hard currency, oil, and productive investment and expertise."  22 U.S.C. § 6081(5), (6).  To deter these foreign investors and to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," *id.* § 6022, Title III of the Act created a private cause of action, available to any United States national who owns a claim to property confiscated by the Cuban Government, against any person who intentionally "traffics" in such property, *id.* § 6082(a)(1)(A) (hereinafter "Title III").

Under Title III, a person "traffics" in confiscated property if that person "knowingly and intentionally" "sells, transfers, distributes, dispenses, brokers, manages or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property . . . [or] engages in a commercial activity using or otherwise benefiting from confiscated property," or if that person "causes, directs, participates in, or profits from, trafficking . . . or otherwise engages in trafficking . . . through another person." *Id.* § 6023(13)(A). As a remedy, claimants may seek the greater of the current market value of the property or the value at the time it was confiscated, plus interest, and may also seek treble damages if, *inter alia*, the trafficker continues to traffic in the confiscated property. *Id.* § 6082(a)(1)(A), (a)(3)(B)-(C).

The enactment of Title III was not welcomed universally. *See, e.g.*, *Havana Club Holding, S.A. v. Galleon S.A.*, 961 F. Supp. 498, 501 n.5 (S.D.N.Y. 1997) (explaining, shortly after the Act's passage, that Title III had been characterized as "objectionable and onerous to United States allies" and that some allies had responded to its passage with "nothing less than 'outrage'"). Perhaps anticipating that reaction, Congress granted the President the power to suspend the private right of action created by Title III if he or she "determines . . . that suspension is necessary to the national interests of the United States and will expedite a transition to democracy in Cuba." *Id.* § 6085(b). Until May 2019, every President had exercised that power. In May 2019, however, President Trump lifted the suspension, allowing Title III claims to proceed for the first time. On November 9, 2020, this litigation followed. ECF No. 1.

## B. Factual Background

In 1958, before Fidel Castro came to power in Cuba, Banco Pujol was the seventh largest Cuban owned bank, controlling $25.1 million in assets. Compl. ¶ 25. On October 14, 1960, the

3

new Castro government confiscated Banco Pujol and absorbed the bank, along with other Cuban owned banks, into BNC. *Id.* ¶ 26. At the time, approximately 1.3% of BNC's total equity came from the property seized from Banco Pujol. *Id.* ¶ 28.

Plaintiffs here are United States citizens (or the estates thereof) who inherited interests in Banco Pujol. *Id.* ¶¶ 6-16, 25. They bring claims under Title III against SG and Paribas, major multinational banks, for trafficking in confiscated Banco Pujol property. *Id.* ¶¶ 36, 43, 61. In particular, Plaintiffs allege that sometime after December 11, 1995, SG opened at least six credit facilities that made loans to BNC or to "a New-Jersey incorporated entity for subsequent transfer to" BNC. *Id.* ¶¶ 36, 37. They allege that between 2000 and 2010, Paribas operated "eight credit facilities" for Cuban banks and "opened U.S.-dollar accounts with Cuban banks," including BNC, "to permit them access to U.S. dollars." *Id.* ¶ 43.

Plaintiffs allege that the opening of these credit facilities, and loans made to BNC, constitute trafficking within the meaning of Title III because BNC "knowingly and intentionally . . . manag[ed], posess[ed], obtain[ed] control of, or otherwise acquir[ed] or [held] an interest in" and "used or benefited from" the property confiscated from Banco Pujol, and SG and Paribas "knowingly and intentionally participated in and profited from BNC's trafficking in [the] confiscated property." *Id.* ¶ 39 (internal quotation marks omitted); *see also id.* ¶ 47. Through these facilities, Plaintiffs allege, SG and Paribas provided BNC with access to U.S. dollar credit facilities that it could not otherwise access and "earned significant profits from operating the . . . facilities." *Id.* ¶¶ 38, 39; *see also id.* ¶¶ 46, 47.

Plaintiffs allege that SG and Paribas also trafficked in property confiscated from Banco Pujol by "knowingly and intentionally engag[ing] in, participat[ing] in, and profit[ing] from commercial activities that used or otherwise benefited from confiscated property." *Id.* ¶ 40

4

(internal quotation marks omitted); *see also id.* ¶ 48.  According to Plaintiffs, SG and Paribas benefited from the property confiscated from Banco Pujol because that property "made BNC a more stable, less risky, and more desirable counterparty than it otherwise would have been" for the credit facilities.  *Id.* ¶¶ 40, 48.  Finally, Plaintiffs allege that SG and Paribas "continue to traffic in" Banco Pujol's confiscated property "in substantially the same manner" by "continu[ing] to operate similar credit facilities," although the facilities now exclude U.S. dollar transactions.  *Id.* ¶¶ 54, 59.

## LEGAL STANDARD

Defendants move jointly to dismiss Plaintiffs' Complaint pursuant to Rules 12(b)(1) and 12(b)(6).  ECF No. 41 ("Defs.' Mem.") at 39.  A Rule 12(b)(1) motion challenges the court's subject-matter jurisdiction to hear the case.  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  In reviewing a motion to dismiss under Rule 12(b)(1), a court "must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff, but jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (internal quotation marks and citation omitted), *aff'd*, 561 U.S. 247 (2010).  "The plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005).

By contrast, a Rule 12(b)(6) motion tests the legal sufficiency of a complaint and requires a court to determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  When

ruling on a Rule 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g.*, *Holmes v. Grubman*, 568 F.3d 329, 335 (2d Cir. 2009). To survive such a motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Defendants advance a handful of arguments in support of dismissal. The Court, however, reaches only two: first, whether Plaintiffs have standing, as that is a "threshold jurisdictional question" and cannot be assumed, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998); and second, whether Plaintiffs' claims are timely. The Court will address each in turn.

### A.  Standing

Article III of the Constitution restricts the "judicial Power" of the United States to "Cases" and "Controversies." U.S. Const. art. III, § 2. In light of that restriction, the Supreme Court has held that a plaintiff must have "standing" to sue. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Significantly, each element "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At the pleading stage, as here, a plaintiff need only "clearly . . . allege facts demonstrating" each element. *Warth v. Seldin*, 422 U.S. 490, 518 (1975).

6

Here, Plaintiffs allege that they suffered injuries sufficient to confer standing because Defendants "use[d], exploit[ed], and derive[d] benefits from their confiscated property, without their permission and without compensating them for the property's use."  ECF No. 48 ("Pls.' Opp'n") at 8-9.  In response, Defendants offer two arguments as to why these injuries are insufficient.  First, they contend that Plaintiffs allege only one true concrete injury, the confiscation of Banco Pujol, and it is not fairly traceable to Defendants' conduct.  Defs.' Mem. 9-10.  Second, and relatedly, Defendants argue that to the extent Plaintiffs allege any injury that is fairly traceable to their trafficking in Plaintiffs' confiscated property, that injury is a mere *statutory* violation and not sufficiently concrete to satisfy the *constitutional* requirements of Article III.  *Id.* at 11-12.  Neither argument is persuasive.

With respect to the first, Plaintiffs allege an injury from Defendants' trafficking that is distinct from the confiscation of Banco Pujol by the Cuban Government.  For example, Plaintiffs allege that Defendants "engag[ed] in commercial activity with BNC, which has included and benefitted from the wrongfully confiscated assets of Banco Pujol since 1960," Compl. ¶ 34; that Defendants "earned significant profits" from this activity, *id.* ¶¶ 38, 46; and that "Plaintiffs [n]ever consented to [Defendants'] trafficking in the confiscated property," *id.* ¶¶ 41, 49.  As many courts that have considered similar claims have recently held, these kinds of injuries are distinct from the original confiscation and "fairly traceable" to the alleged trafficker.  *See, e.g.*, *Exxon Mobil Corp. v. Corporación CIMEX S.A.*, No. 19-CV-01277 (APM), 2021 WL 1558340, at *21 (D.D.C. Apr. 20, 2021) ("Congress has defined Exxon's injury in terms of the effects of trafficking in the confiscated property, and that injury is plainly 'fairly traceable' to Defendants' alleged trafficking."); *see also Glen v. Trip Advisor LLC*, 529 F. Supp. 3d 316, 327-28 (D. Del. 2021) ("Congress . . . observed that the rightful owners' injury stemmed from both the Cuban

government's confiscation of the property and subsequent traffickers' use of that confiscated property."). Put simply, Plaintiffs allege injury from Defendants' "use" and "exploit[ation]" of their confiscated property. Pls.' Opp'n 8-9. That harm is plainly traceable to Defendants' setting up credit facilities for, and making loans to, BNC.

With respect to the second argument — that Plaintiffs' alleged injuries are insufficiently concrete to satisfy Article III — Defendants are, of course, correct that "'a plaintiff [does not] automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'" *Thole v. U. S. Bank N.A*, 140 S. Ct. 1615, 1620 (2020) (quoting *Spokeo*, *Inc.*, 136 S. Ct. at 1549). Plaintiffs must *also* allege a concrete injury in fact. *See id.* At the same time, the Supreme Court has explained that "'[c]oncrete' is not . . . necessarily synonymous with 'tangible'" and that "Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." *Spokeo*, *Inc.*, 136 S. Ct. at 1549 (cleaned up). In evaluating whether Congress has exercised that authority, a court must "consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Id.*; *see also Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, No. 19-1774, 2021 WL 5347004, at *4 (2d Cir. Nov. 17, 2021).

Doing so here, the Court concludes that Congress did indeed "elevate to the status of legally cognizable" a harm that has traditionally been regarded as providing a basis for a lawsuit in American courts: the harm of unjust enrichment. "The equitable doctrine of unjust enrichment rests, generally, on the principle that a party should not be allowed to enrich himself at the expense of another." *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 263 (2d Cir. 1984). In this case, the gravamen of Plaintiffs' claims is that Defendants were unjustly enriched by the

"significant profits" they earned based, in part, on Banco Pujol's confiscated assets.  Compl.

¶¶ 38, 46.  In fact, Congress itself recognized the relationship between unjust enrichment and

claims under the statute, finding that "[t]he international judicial system, as currently structured,

lacks fully effective remedies . . . *for unjust enrichment* from the use of wrongfully confiscated

property by governments and private entities at the expense of the rightful owners of the

property."  22 U.S.C. § 6081(8) (emphasis added); *see also Glen v. Am. Airlines, Inc.*, 7 F.4th

331, 334 (5th Cir. 2021) ("The harm allegedly caused by [the defendant's] trafficking bears a

close relationship to unjust enrichment, which has indisputable common-law roots.").

Defendants argue that Plaintiffs cannot state a claim for unjust enrichment because they no

longer own Banco Pujol's property, ECF No. 51 ("Defs.' Reply") at 3-4, but that argument

misapprehends the analysis.  To establish standing, Plaintiffs need not bring an unjust

enrichment claim or a claim that has identical elements; it suffices for them to allege a statutory

violation that is *closely related to* "a harm that has traditionally been regarded as providing a

basis for a lawsuit."  *Spokeo, Inc.*, 136 S. Ct. at 1549.  They do so.

      In short, Plaintiffs have standing to pursue their claims under the Helms-Burton Act.

Notably, in reaching that conclusion, the Court joins every other court that has addressed the

issue in the wake of President Trump's decision to lift the suspension.  *See Glen*, 7 F.4th at 336;

*N. Am. Sugar Indus. Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, No. 20-CV-22471 (DPG), 2021

WL 3741647, at *5 (S.D. Fla. Aug. 24, 2021); *Exxon Mobil Corp.*, 2021 WL 1558340, at *21;

*Glen*, 529 F. Supp. 3d at 328; *Havana Docks Corp. v. Carnival Corp.*, No. 19-CV-21724 (BB),

2020 WL 5517590, at *8 (S.D. Fla. Sept. 14, 2020); *Havana Docks Corp. v. MSC Cruises SA

Co.*, 484 F. Supp. 3d 1177, 1195 (S.D. Fla. 2020); *Havana Docks Corp. v. Norwegian Cruise*

*Line Holdings, Ltd.*, 484 F. Supp. 3d 1215, 1231 (S.D. Fla. 2020); *Iglesias v. Ricard*, No. 20-CV-20157 (KMW), 2020 U.S. Dist. LEXIS 164117, at *29 (S.D. Fla. Aug. 17, 2020).

## B. Timeliness

With that, the Court turns to the merits of Plaintiffs' claims.  Defendants make various alternative arguments for why Plaintiffs fail to state a claim, but the Court reaches only one: that Plaintiffs' claims are time barred.  Defendants contend that Plaintiffs' claims are untimely based on Section 6084 of the Helms-Burton Act, which provides that "[a]n action under section 6082 of this title [i.e., for trafficking] may not be brought more than 2 years after the trafficking giving rise to the action has ceased to occur."  22 U.S.C. § 6084.  Defendants argue that this time limit bars Plaintiffs' claims because Plaintiffs fail to allege any trafficking that occurred in the two years prior to their filing suit in November 2020 and because the time limit is a statute of repose not subject to equitable exceptions.  Defs.' Mem. 12-18.  Defendants point to allegations in the Complaint that "SocGen processed at least 2,500 transactions — valued at $13 billion — through New York financial institutions between 2004 and 2010," Compl. ¶ 37, and that "from at least 2000 to 2010, Paribas offered U.S.-dollar financing to Cuban entities," *id.* ¶ 43.  Defendants contend that these allegations show that any trafficking ended in 2010, well outside the statutory time limit.

Plaintiffs offer several responses.  First and most straightforward, they contend that their claims are timely because, in addition to the conduct through 2010, the Complaint alleges that Defendants "continue to traffic in Plaintiffs' property in substantially the same manner" and that "[b]oth Defendants continue to operate similar credit facilities."  *Id.* ¶ 54; *accord id.* ¶ 59; *see* Pls.' Opp'n 26-27.  But when it comes to assessing timeliness, such conclusory assertions of "continuing" or "ongoing" conduct do not cut it.  *See, e.g., Chiu v. Au*, No. 03-CV-1150 (RNC),

2005 WL 2452565, at *3 (D. Conn. Sept. 30, 2005) (holding that the plaintiff's allegations "in conclusory terms that the defamation against him is ongoing" were "too vague to state a claim for relief that is not barred by the statute of limitations"); *Broughton v. Livingston Indep. Sch. Dist.*, No. 08-CV-175 (TH), 2009 WL 10707489, at *6 (E.D. Tex. June 11, 2009) (same); *cf. Shomo v. City of New York*, 579 F.3d. 176, 181 (2d Cir. 2009) ("To trigger the continuing violation doctrine when challenging discrimination, the plaintiff must allege both the existence of an ongoing policy of discrimination *and some non-time-barred acts taken in furtherance of that policy*." (internal quotation marks omitted) (emphasis added)); *Gaughan v. Nelson*, No. 94-CV-3859 (JFK), 1997 WL 80549, at *5 (S.D.N.Y. Feb. 26, 1997) (holding that "a few non-specific and conclusory allegations of" discriminatory conduct within the time limitation were not sufficient to establish timeliness under a continuing violations theory); *see also generally Iqbal*, 556 U.S. at 678, 678 (holding that "naked assertions devoid of further factual enhancement" are not sufficient to state a claim and that a court need not accept as true "conclusory statements" in a complaint (cleaned up)).

Plaintiffs further argue that "Defendants' own admissions support an inference of continued trafficking" because (1) Defendants previously disregarded U.S. criminal law in pursuit of profits related to the facilities; (2) Defendants "renewed [the] facilities in Euros" after facing liability in the United States; (3) BNC maintains an office in Paris to conduct business with French banks; and (4) Defendants did not affirmatively say, in response to Plaintiffs' claims, that they had stopped trafficking in confiscated property. *Id.* at 27-28. But these arguments do not withstand scrutiny. The fact that Defendants *previously* disregarded U.S. criminal law in connection with the facilities says nothing about whether they *continued* to do so during the limitations period. So too, it is a non sequitur to suggest that Defendants continue to

offer credit facilities to BNC simply because BNC has an office in Paris and Defendants are Paris-based banks.  And at this stage of the litigation, the mere fact that Defendants have not affirmatively denied Plaintiffs' allegations does not mean that the allegations are plausible.  That leaves the alleged fact that Defendants "renewed," ECF No. 29-2, at 47, or "converted," ECF No. 29-3, at 51, the facilities into Euros.  *See* Compl. ¶¶ 54, 59.  The alleged renewals and conversions, however, happened in 2010.  ECF No. 29-2, at 47; ECF No. 29-3, at 51.  Moreover, there is no indication that either Defendant renewed facilities available *to BNC* as opposed to other Cuban entities to which they made credit facilities available.  *See* ECF No. 29-2, at 47 (noting, with respect to some of the facilities, that SG "did not renew them at the end of their term").[1]  When push comes to shove, "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct" after 2010.  *Iqbal*, 556 U.S. at 679; *see also Twombly*, 550 U.S. at 570 (noting that a complaint "must be dismissed" if "the plaintiffs . . . have not nudged their claims across the line from conceivable to plausible").

Perhaps recognizing that their allegations of misconduct since 2010 are inadequate, Plaintiffs make a second argument: that, at the Rule 12(b)(6) stage, dismissal based on timeliness is appropriate only if it is clear from "'the face of the complaint'" that the claims are time-barred. Pls.' Opp'n 26 (citing *Conn. Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 132 (2d Cir. 2021)).  Defendants argue that is not the case here because the relevant provision is a statute of repose, not a statute of limitation, and thus timeliness is not an affirmative defense, but "'defines the right.'"  Defs.' Reply 9 (citing *P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92,

---

[1]	Defendants argue that, to the extent Plaintiffs' allegations regarding non-U.S. dollar transactions would otherwise salvage their claims, "the action would *still* have to be dismissed under Rule 12(b)(2) for lack of personal jurisdiction."  Defs.' Mem. 18.  In light of the Court's conclusions above, it need not and does not consider this alternative argument.

2d Cir. 2004)). Relatedly, they cite cases for the proposition that "when the very statute which creates the cause of action also contains a limitation period, the plaintiff must plead and prove facts showing that he is within the statute." *Mori v. Saito*, 10-CV-6465 (KBF), 2013 WL 1736527, at *3 (S.D.N.Y. Apr. 19, 2013) (cleaned up). But the Court need not and does not decide who has the better of that debate because, even if Plaintiffs are right, the doctrine provides them no relief. That is because Plaintiffs — whether they were required to do so or not — explicitly allege that Defendants' trafficking conduct ended more than a decade ago. *See* Compl. ¶ 37 ("SocGen processed at least 2,500 transactions — valued at $13 billion — through New York financial institutions between 2004 and 2010."); *id.* ¶ 43 ("[F]rom at least 2000 to 2010, Paribas offered U.S.-dollar financing to Cuban entities."). Plaintiffs may be right that "'no information' [about timeliness] precludes dismissal," Pls.' Opp'n. 27 (quoting *Fargas v. Cincinnati Mach., LLC*, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013)), but their Complaint *has* information — namely, the specific dates of Defendants' alleged conduct. That is, ignoring Plaintiffs' conclusory allegations about "continuing" and "ongoing" conduct, as the Court must for the reasons discussed above, the Court is left with a Complaint that, on its face, does reveal the claims to be time barred. *See* 5B Fed. Prac. & Proc. Civ. § 1357 (3d ed.) ("[T]he inclusion of dates in the complaint indicating that the action is untimely renders it subject to dismissal for failure to state a claim. This particularly is true if the action sued on is statutory in origin, because the bar of the statute of limitations then is said to extinguish not only the remedy but the underlying substantive right as well." (footnotes omitted)).[2]

---

[2]      Plaintiffs also cite *Havana Docks Corp.*, 2020 WL 5517590. *See* Pls.' Opp'n 26. But there, the court concluded that the plaintiff had alleged both instances of trafficking that had occurred in the prior two years *and* older instances. *Id.* at *11. In that context, the court noted that "the Amended Complaint sets forth only one count, sues only one defendant, and alleges trafficking relating to one Subject Property and linked to one Certified Claim" and "reject[ed] the

That leaves only Plaintiffs' final argument: that the time bar in Section 6084 was tolled — either equitably or per the statute's terms — during the time that Title III was suspended at the direction of the President (i.e., until 2019). Pls.' Opp'n 28-33. Whether equitable tolling is available turns in the first instance on whether Section 6084 is a statute of limitation or a statute of repose, as the Supreme Court has made clear that statutes of repose are "in general not subject to tolling." *Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2050 (2017). Instead, "[t]olling is permissible only where there is a particular indication that the legislature did not intend the statute to provide complete repose but instead anticipated the extension of the statutory period under certain circumstances." *Id.*; *see also Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106 (2d Cir. 2013) ("[A] statute of repose is subject only to legislatively created exceptions, and not to equitable tolling." (cleaned up)); *accord United States ex rel. Wood v. Allergan, Inc.*, No. 19-CV-4029 (JMF), 2020 WL 3073293, at *2 (S.D.N.Y. June 10, 2020). Defendants argue that Section 6084 is a statute of repose and, therefore, not subject to equitable tolling. Defs.' Mem. 12. Plaintiffs counter that Section 6084 is a statute of limitations and that it was equitably tolled. Pls.' Opp'n 31-32.

Defendants have the better of the argument. The time limitation in Section 6084 runs from the date "the trafficking giving rise to the action has ceased to occur." 22 U.S.C. § 6084. In other words, it runs from "the defendant's last culpable act[,] . . . not from the accrual of the claim." *Cal. Pub. Emps.' Ret. Sys.*, 137 S. Ct. at 2049. That alone is a "close to a dispositive

---

notion that Plaintiff's single-count Amended Complaint is actionable only as to certain allegations but not as to others." *Id.* The situation here is different because Plaintiffs, as described above, do not adequately allege any timely claims of trafficking. The Court need not and does not consider whether, had Plaintiffs alleged some timely claims, it would be permissible to consider Defendants' actions since setting up the credit facilities as a single act of trafficking.

indication that the statute is one of repose." *Id.* Moreover, by bluntly providing that a trafficking action "may not be brought" more than two years after a defendant's last culpable act, Section 6084 "admits of no exception and on its face creates a fixed bar against future liability." *Id.* Finally, one of Congress's primary purposes in passing the Helms-Burton Act was to strengthen sanctions on the Cuban government by deterring foreign investors from doing business with Cuba. *See* 22 U.S.C. § 6081(5), (6); *see also id.* § 6082(a)(1)(A) (providing that companies would not be subject to liability if they ceased trafficking within three months of the Act's effective date). That goal is better served by a statute of repose, which gives investors an incentive to cease doing business with Cuba by making them "free from liability after the legislatively determined period of time." *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014). Thus, Section 6084 is more naturally read to be a statute of repose.

Plaintiffs offer no persuasive argument to the contrary. They argue that the date on which "the trafficking giving rise to that action has ceased to occur," 22 U.S.C. § 6084, is also "the date on which the plaintiff last suffered an injury," Pls.' Opp'n 32, but the Supreme Court has explained that "limitations periods begin to run *when the cause of action accrues*," *Cal. Pub. Emps.' Ret. Sys.,* 137 S. Ct. at 2049 (internal quotation marks omitted) (emphasis added), *not* "the date on which the plaintiff has suffered an injury," Pls.' Opp'n 32. Here, the cause of action would have *accrued* much earlier, when Defendants first trafficked in Plaintiffs' property, which Plaintiffs allege to be 2000 and 2004, respectively. Compl. ¶¶ 37, 43; *see also* 22 U.S.C. 6082(a)(1)(A) (providing that a cause of action accrues as soon as the defendant "traffics in property"). Plaintiffs also argue that where a statute is one of repose, "the injury need not have occurred" before repose is given. Pls.' Opp'n 32 (quoting *CTS Corp.*, 573 U.S. at 8). That is true (because a statute of repose is keyed to the defendant's conduct, not the plaintiff's injury),

but it does not follow that where the injury has already occurred, the time limit must be a statute of limitations and not a statute of repose.  Plaintiffs further argue that Congress's intent was to "provid[e] victims with a judicial remedy" and that that goal is best served by treating Section 6084 as a statute of limitations.  Pls.' Opp'n 33 (internal quotation marks omitted).  But that goal is also served by a statute of repose, which, in addition to providing finality to defendants, "also encourage[s] plaintiffs to bring actions in a timely manner, and for many of the same reasons [as a statute of limitations]."  *CTS Corp.*, 573 U.S. at 9.  Finally, Plaintiffs argue that Section 6084 does not include "categorical language" such as "in no event." Pls.' Opp'n 33.  But, as Defendants rightly point out, many statutes of repose do not.  Defs.' Reply 7 (citing 29 U.S.C. § 1113(1) and other examples).

In the alternative, Plaintiffs argue that, under the statute itself, any time during which the right to bring suit under Section 6082 is "suspend[ed]" by the President is excluded from the time in which suit must be brought under Section 6084.  Pls.' Opp'n 29 (citing 22 U.S.C. § 6085(c)(1)-(2), (d)).  Plaintiffs contend that "suspend" in Section 6085(b) should be read to mean "toll," such that any cause of action that accrues during a presidential suspension is delayed until the suspension is lifted.  Plaintiffs contrast Section 6085 with the language in Section 6082(h), which provides that "[a]ll rights created under this section . . . shall cease" upon a determination that a democratically elected government has come to power in Cuba.  *Id.* at 29-30 (quoting 22 U.S.C. § 6082(h)).  Had Congress intended a suspension to foreclose claims where more than two years had lapsed, Plaintiffs assert, Congress would have made that clear as it did in Section 6082(h).  Finally, Plaintiffs point to statements made by the President and executive branch officials after the Act was adopted, to the effect that "liability would be established irreversibly during the suspension period" and that during the suspension period,

"liability accrues" and "can't be extinguished subsequently."  Pls.' Opp'n 30 (first quoting President Statement on Helms-Burton Waiver Exercise, 1996 WL 396122, at \*1-2 (July 16, 1996), then quoting Briefing on Helms-Burton Act Title III Suspension, 1996 WL 396125, at \*5 (July 16, 1996) (hereinafter "Briefing")).

      The Court is not persuaded.  "When interpreting a statute," a court must "begin with the text.  [It] must give effect to the text's plain meaning, . . . [which] draws on the specific context in which that language is used, and the broader context of the statute as a whole.  Where the plain meaning of the text is clear, [the] inquiry generally ends there." *Jingrong v. Chinese Anti-Cult World All. Inc.*, 16 F.4th 47, 57 (2d Cir. 2021) (cleaned up).  Here, the meaning of the relevant text, Section 6085(c)(1)(B), is plain.  It provides only that "the President may suspend the right to bring an action" under the Act (if the President makes certain findings and reports to Congress) and makes no reference to Section 6084 or the time within which a plaintiff must bring an action in the first instance.  22 U.S.C. § 6085(c)(1)(B).  By contrast, Congress did explicitly provide elsewhere in the statute that a suspension of actions "shall not affect suits commenced before the date of such suspension."  *Id.* § 6085(c)(3).  That provision shows that Congress "knew how to" make clear when suspension pursuant to Section 6085(c)(1)(B) would not affect a cause of action under Title III and that Congress "chose not to do so" with respect to causes of action that would be barred by Section 6084.  *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 394 (2015); *see, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)).

This reading is reinforced by the fact, noted above, that one of Congress's principal purpose in enacting Title III — as evidenced by the three-month safe harbor in Section 6082(a)(1)(A) — was not to maximize victim compensation, but rather to compel companies to cease doing business with Cuba on the theory that doing so would hasten the fall of the Castro regime.  *See* 22 U.S.C. § 6081(6) ("'[T]rafficking' in confiscated property provides badly needed financial benefit . . . to the current Cuban Government and thus undermines the foreign policy of the United States . . . to bring democratic institutions to Cuba through the pressure of a general economic embargo at a time when the Castro regime has proven to be vulnerable to international economic pressure."); *see also Havana Club Holding, S.A.*, 961 F. Supp. at 501 ("The [Helms-Burton] Act has further tightened the embargo in . . . [an] attempt to topple the Castro regime."). Barring liability more than two years after the last date of trafficking advances that purpose because it provides putative defendants an unequivocal incentive to cease the conduct that Congress aimed to deter.  By contrast, Plaintiffs' reading of the statute would undermine that goal.  Knowing that they would continue to face liability for an additional two years after a suspension was lifted, without regard for when they ceased trafficking, traffickers would have little incentive to cease trafficking any time during a suspension.  In other words, traffickers would be incentivized to *continue* trafficking until the day the suspension was lifted.  That is not the result that Congress intended.

Plaintiffs' counterarguments fall short.  First, it is immaterial that "the terms 'toll' and 'suspend'" are "interchangeabl[e]."  *Artis v. D.C.*, 138 S. Ct. 594, 601-02 (2018), *quoted at* Pls.' Opp'n 29.  The question here is *what* a presidential suspension tolls.  By the statute's terms, the answer is "the right to bring an action," 22 U.S.C. § 6085(c)(1)(B), not the time bar in Section 6084.  Second, Section 6082(h) — which provides that "[a]ll rights created under this section . . .

shall cease" upon a determination that a democratically elected government has come to power in Cuba — actually cuts against Plaintiffs' reading of the statute because it makes plain that Congress's principal purpose was to bring about regime change in Cuba (by forcing companies to cease doing business there), not to maximize victim compensation. Finally, statements by the President and other executive branch officials cannot, of course, alter the plain meaning of a statute. *Cf. Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (providing that no deference should be given to an executive branch agency's interpretation of a statute where "the intent of Congress is clear" because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress"). In any event, the statements at issue, considered in context, refer only to the fact that the executive branch's initial strategy was "to allow Title III to come into effect" while "suspend[ing] for a six-month period the right to file individual suits," giving the executive branch time to "work vigorously with allies and with foreign companies to build support for a series of steps to promote democracy in Cuba." Briefing, 1996 WL 396125 at *2. There is no indication that the speakers envisioned the suspension lasting for twenty-three more years. And regardless, nothing in the statements speaks to the implications of the suspension with respect to Section 6084.

In short, the Court concludes that Section 6084 was not tolled by the suspensions of Title III. Accordingly, and for the reasons discussed above, Plaintiffs' claims are untimely.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED on the ground that Plaintiffs' claims are time barred under Section 6084. Nevertheless, mindful that leave to amend a complaint should be freely given "when justice so requires," Fed. R. Civ. P. 15(a)(2), and that it is "within the sound discretion of the district court to grant or deny leave to amend,"

*Ahmed v. GEO USA LLC*, No. 14-CV-7486 (JMF), 2015 WL 1408895, at *5 (S.D.N.Y. Mar. 27, 2015) (internal quotation marks omitted), the Court exercises its discretion and grants Plaintiffs' request for leave to amend.  Pls.' Opp'n 8 n.1.  Plaintiffs may not be able to cure the defects in their claims — after all, if they could have alleged in non-conclusory fashion that Defendants' alleged trafficking continued beyond 2010, one assumes they would have — but the Court concludes they should be given a chance to do so with the benefit of this Opinion and Order. *See, e.g.*, *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).  Plaintiffs shall file any Second Amended Complaint **within thirty days of the date of this Opinion and Order**.  If Plaintiffs do so, the Court will convene a conference to discuss next steps, mindful that the parties have already briefed Defendants' other arguments for dismissal (as to which the Court intimates no view here).  If Plaintiffs fail to file a Second Amended Complaint by the deadline, the Court will dismiss the case without further notice.  The Clerk of Court is directed to terminate ECF No. 40.

        SO ORDERED.

Dated: November 24, 2021
        New York, New York

_____
JESSE M. FURMAN
United States District Judge

20