## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| JUAN B. PUJOL MOREIRA, in his personal capacity, and as Personal Representative and Administrator of the ESTATE OF NIEVES PUJOL, a/k/a NIEVES MOREIRA MARTINEZ, MARIA JULIA PUJOL MOREIRA, INÉS MARIA PUJOL FAGET, as Personal Representative and Executor of the ESTATE OF ARCADIO JOAQUIN PUJOL IZQUIERDO, SARA L. PUJOL, as Personal Representative and Administrator of the ESTATE OF LAUREANO PUJOL ROJAS, LUIS R. PUJOL ROJAS, ANA H. FRAGA, LORENZO PÉREZ PUJOL, FRANCISCO PUJOL MENESES, PILAR M. PUJOL MENESES, and RAÚL PUJOL MENESES, | Case No. 20 Civ. 9380 (JMF) |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| SOCIÉTÉ GÉNÉRALE, S.A. and BNP PARIBAS, S.A., | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

Plaintiffs Juan B. Pujol Moreira, in his personal capacity and as Personal Representative and Administrator of the Estate of Nieves Pujol, a/k/a Nieves Moreira Martinez; Maria Julia Pujol Moreira; Inés Maria Pujol Faget, as Personal Representative and Executor of the Estate of Arcadio Joaquin Pujol Izquierdo; Sara L. Pujol, as Personal Representative and Administrator of the Estate of Laureano Pujol Rojas; Luis R. Pujol Rojas; Ana H. Fraga; Lorenzo Pérez Pujol; Francisco Pujol Meneses; Pilar M. Pujol Meneses; and Raúl Pujol Meneses (collectively, "Plaintiffs"), for their complaint against Société Générale, S.A. ("SocGen") and BNP Paribas, S.A. ("Paribas")

(collectively, "Defendants"), for violations of the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* ("Helms-Burton"), state:

## INTRODUCTION

1.      This is an action for damages arising from the confiscation of property by the Cuban Government against two banks that traffic in that property in violation of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act, Pub. L. 104-114, 110 Stat. 785, 22 U.S.C. §§ 6021-6091, commonly known as the Helms-Burton Act.

2.      Before Fidel Castro came to power, Banco Pujol was a flourishing enterprise owned by cousins Juan M. Pujol Balmaseda, Laureano Pujol Izquierdo, Arcadio Joaquin Pujol Izquierdo, Dulce Maria Pujol Izquierdo, and Raúl Pujol Izquierdo (the "Owners").  Founded in 1893, Banco Pujol grew to become the seventh largest Cuban-owned bank on the island in terms of assets.[1]  The Cuban Government confiscated Banco Pujol on October 14, 1960, and consolidated it into the state-controlled Banco Nacional de Cuba ("BNC").  About 1.3% of BNC's equity was derived from property confiscated from Banco Pujol.  Before confiscation, Banco Pujol controlled $25.1 million in assets, including $10.1 million in loans.  It had a book value in excess of $1 million and a significantly higher fair market value.  Despite confiscating their bank, the Cuban Government never compensated the Owners.

3.      In 1960 and 1961, the Owners fled Cuba for the United States to escape the extrajudicial killings, unjustified imprisonment, and cruelty that would come to embody Castro's

---

[1] *See* December 31, 1958, *Esta Era la Banca de Cuba a la Llegada del Comunismo*, attached hereto as **Exhibit 1**.  From 1948 to 1958, the Cuban peso traded at par with the United States dollar.  *See* Armando M. Lago & José Alonso, *A First Approximation Model of Money, Prices and Exchange Rates in Revolutionary Cuba*, Association for the Study of the Cuban Economy (Nov. 30, 1995), https://www.ascecuba.org/asce_proceedings/a-first-approximation-model-of-money-prices-and-exchange-rates-in-revolutionary-cuba/.

reign.  Owner Juan M. Pujol Balmaseda died a United States citizen in 1984, leaving his entire interest in Banco Pujol to his heirs Nieves Pujol, a/k/a Nieves Moreira Martinez (deceased), Juan B. Pujol Moreira, and Maria Julia Pujol Moreira.  Owner Arcadio Joaquin Pujol Izquierdo died a United States citizen in 2003.  Owner Laureano Pujol Izquierdo died a United States citizen in 1979, leaving his entire interest in Banco Pujol to his heirs Laureano Pujol Rojas (deceased) and Luis R. Pujol Rojas.  Owner Dulce Maria Pujol Izquierdo died a United States citizen in 1973, leaving her entire interest in Banco Pujol to her heirs Ana H. Fraga and Lorenzo Pérez Pujol. Owner Raúl Pujol Izquierdo died a United States citizen in 1985, leaving his entire interest in Banco Pujol to his heirs Francisco Pujol Meneses, Pilar M. Pujol Meneses, and Raúl Pujol Meneses.

4.      In 1996, Congress observed that the Cuban Government was seeking to raise "hard currency" by "offering foreign investors" opportunities to enter into ventures that benefited from the use of property confiscated by the Cuban Government.  Congress passed the Helms-Burton Act to deter such " 'trafficking' in confiscated property" by creating a private right of action.  That statute allows United States nationals to bring an action against anyone who intentionally traffics in property confiscated by the Cuban Government.  Starting in 2000 at the latest—four years after the enactment of the Helms-Burton Act—SocGen and Paribas began trafficking in property known to be confiscated by the Cuban Government.  That property included the Plaintiffs' share of the new conglomerated BNC.  SocGen and Paribas together earned more than $1 billion in profit from their trafficking, conducting many transactions through their New York branches in this District.

5.      On August 23, 2019 and August 20, 2020, Plaintiffs sent notices to SocGen, and on February 17, 2020, Plaintiffs sent a notice to Paribas, demanding that each immediately cease

trafficking in Plaintiffs' property.  Plaintiffs now seek damages and attorneys' fees as provided under the Helms-Burton Act based on Defendants' violations of the Act.

## PARTIES AND RELEVANT NONPARTIES

6.      Plaintiff Juan B. Pujol Moreira is the Personal Representative and Administrator of the Estate of Nieves Pujol, a/k/a Nieves Moreira Martinez.  Nieves Pujol, a/k/a Nieves Moreira Martinez, who died in 2006, was Owner Juan M. Pujol Balmaseda's wife.  She inherited an interest in Banco Pujol from her husband before, and held that interest on, March 12, 1996.  She had been a United States citizen at least since March 12, 1996.  Nieves Pujol's estate was opened for the first time in September 2020 and Juan B. Pujol Moreira was later appointed as personal representative after discovery that the estate held a claim to Banco Pujol under the Helms-Burton Act. That claim was held by the estate before the original complaint was filed in this action on November 9, 2020, and is currently held by the estate.

7.      Plaintiff Juan B. Pujol Moreira is Owner Juan M. Pujol Balmaseda's son.  Juan B. Pujol Moreira inherited an interest in Banco Pujol from his father before, and held that interest on, March 12, 1996.  Juan B. Pujol Moreira has been a United States citizen at least since March 12, 1996.

8.      Plaintiff Maria Julia Pujol Moreira is Owner Juan M. Pujol Balmaseda's daughter. She inherited an interest in Banco Pujol from her father before, and held that interest on, March 12, 1996.  She has been a United States citizen at least since March 12, 1996.

9.      Plaintiff Inés Maria Pujol Faget is the Personal Representative and Executor of the Estate of Arcadio Joaquin Pujol Izquierdo.  Arcadio Joaquin Pujol Izquierdo, who died in 2003, was an Owner of Banco Pujol when it was confiscated and held an interest in it on March 12, 1996. He had been a United States citizen at least since March 12, 1996.  In August 2020, a Florida court

issued an order reopening Arcadio Joaquin Pujol Izquierdo's estate and directing Inés Maria Pujol Faget to continue serving as personal representative for the estate after discovery that the estate held a claim to Banco Pujol under the Helms-Burton Act.[2]  That claim was held by the estate before the original complaint was filed in this action on November 9, 2020, and is currently held by the estate.

10.     Plaintiff Sara L. Pujol is the Personal Representative and Administrator of the Estate of Laureano Pujol Rojas.  Laureano Pujol Rojas, who died in 2001, was Owner Laureano Pujol Izquierdo's son.  He inherited an interest in Banco Pujol from his father before, and held that interest on, March 12, 1996.  Laureano Pujol Rojas had been a United States citizen at least since March 12, 1996.  In August 2020, a Florida court issued an order reopening Laureano Pujol Rojas's estate and directing Sara L. Pujol to continue serving as personal representative for the estate after discovery that the estate held a claim to Banco Pujol under the Helms-Burton Act.[3]  That claim was held by the estate before the original complaint was filed in this action on November 9, 2020, and is currently held by the estate.

11.     Plaintiff Luis R. Pujol Rojas is Owner Laureano Pujol Izquierdo's son.  He inherited an interest in Banco Pujol from his father before, and held that interest on, March 12, 1996.  Luis R. Pujol Rojas has been a United States citizen at least since March 12, 1996.

12.     Plaintiff Ana H. Fraga is Owner Dulce Maria Pujol's daughter.  Ana H. Fraga inherited an interest in Banco Pujol from her mother before, and held that interest on, March 12, 1996.  Ana H. Fraga has been a United States citizen at least since March 12, 1996.

---

[2] Additional orders have since issued to keep the estate open and to direct Inés Maria Pujol Faget to continue serving as personal representative through the end of this litigation.
[3] Additional orders have since issued to keep the estate open and to direct Sara L. Pujol to continue serving as personal representative through the end of this litigation.

13.     Plaintiff Lorenzo Pérez Pujol is Owner Dulce Maria Pujol's son.  He inherited an interest in Banco Pujol from his mother before, and held that interest on, March 12, 1996.  He has been a United States citizen at least since March 12, 1996.

14.     Plaintiff Francisco Pujol Meneses is Owner Raúl Pujol Izquierdo's son.  Francisco Pujol Meneses inherited an interest in Banco Pujol from his father before, and held that interest on, March 12, 1996.  Francisco Pujol Meneses has been a United States citizen at least since March 12, 1996.

15.     Plaintiff Pilar M. Pujol Meneses is Owner Raúl Pujol Izquierdo's daughter.  She inherited an interest in Banco Pujol from her father before, and held that interest on, March 12, 1996.  She has been a United States citizen at least since March 12, 1996.

16.     Plaintiff Raúl Pujol Meneses is Owner Raúl Pujol Izquierdo's son.  Raúl Pujol Meneses inherited an interest in Banco Pujol from his father before, and held that interest on, March 12, 1996.  Raúl Pujol Meneses has been a United States citizen at least since March 12, 1996.

17.     Defendant Société Générale, S.A., is a French multinational bank and financial services company headquartered in Paris, France, with substantial business operations in New York, New York.

18.     Defendant BNP Paribas, S.A., is a French multinational bank and financial services company headquartered in Paris, France, with substantial business operations in New York, New York.

19.     The Republic of Cuba, a nonparty to this case, is a sovereign state composed of the island of Cuba, as well as Isla de la Juventud and several minor archipelagos.

20.     Nonparty Banco Nacional de Cuba ("BNC") is part of the Cuban Government. After nationalization of Cuba's banking system in 1960, BNC operated as the island's sole banking institution and regulator of all foreign payments.   Today, BNC continues to function "as a commercial bank."   It also serves as regulator of "external debt" that the Cuban State and BNC "have contracted with foreign creditors" and that is backed by "the guarantee of the [Cuban] State." BNC is the primary financial institution with whom foreign companies do business in or with Cuba.

## JURISDICTION AND VENUE

21.     Defendant Société Générale, S.A., is a multinational bank headquartered at 29 Blvd. Haussman, 9th Arrondissement, Paris, France.   SocGen purposefully availed itself of the privilege of doing business in this forum by maintaining a branch in this forum and by conducting banking business in New York through its branch located at 245 Park Avenue, New York, New York 10029.   Using that branch, SocGen has maintained credit facilities that have cleared a substantial number of payments on behalf of BNC.[4]   Plaintiffs' claim arises out of or relates to transactions involving its U.S. operations, including its New York Branch.   SocGen has been present in the United States since the 1930s and continues to maintain a substantial presence, employing more than 2,500 people in North America.

22.     Defendant BNP Paribas, S.A., is a multinational bank headquartered at 16 Blvd. des Italiens, Paris, France.   Paribas purposefully availed itself of the privilege of doing business in this forum by maintaining a branch in this District at 787 7th Avenue, New York, New York 10019.   Paribas has maintained credit facilities and routed wire transfers for BNC's benefit through

---

[4] SocGen Deferred Prosecution Agreement, Statement of Facts ¶ 12, attached hereto as **Exhibit 2** (hereafter "SocGen DPA").

its New York branch.  Plaintiffs' claim arises out of or relates to transactions involving its U.S. operations, including its New York Branch.[5]  Paribas has been present in the United States since the late 1800s and continues to maintain a substantial presence, employing more than 16,000 people in North America.

23.     This Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1331. Plaintiffs bring a civil action that arises under federal law, 22 U.S.C. § 6082.

24.     Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b)(1) because Defendants reside or are deemed to reside in the Southern District of New York under 28 U.S.C. § 1391(c) and (d).  Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District, including each Defendant's use of its respective New York branch to maintain credit facilities or process wires for the benefit of BNC.  Alternatively, venue is proper under 28 U.S.C. § 1391(b)(3) because Defendants are subject to personal jurisdiction in this District with respect to this action.

## FACTUAL ALLEGATIONS

### I.     Cuba Nationalizes Banco Pujol and Other Banks

25.     Founded in 1893, Banco Pujol was a flourishing Cuban bank owned by Juan M. Pujol Balmaseda, Laureano Pujol Izquierdo, Arcadio Joaquin Pujol Izquierdo, Dulce Maria Pujol Izquierdo, and Raúl Pujol Izquierdo.  It had fourteen branches, with a physical presence in three of Cuba's six provinces.  On December 31, 1958, the day before Fidel Castro seized power, Banco Pujol was the seventh largest Cuban-owned bank on the island, controlling $25.1 million in assets, including $10.1 million in loans, and had equity of $1.0 million.[6]

---

[5] See Paribas Guilty Plea, Statement of Facts ¶ 53, attached hereto as **Exhibit 3** (hereafter "Paribas Guilty Plea").
[6] See n.1, *supra*.

26.     After Castro seized power, the Cuban Government began nationalizing every bank on the island—including foreign banking institutions—and absorbing those banks into the state-controlled entity Banco Nacional de Cuba ("BNC").  On October 14, 1960, Cuba confiscated and nationalized all remaining Cuban-owned banks, including Banco Pujol.  Using that confiscated property, BNC began operating as Cuba's sole financial institution with responsibility for conducting or overseeing all monetary policy, commercial banking, borrowing, and lending in Cuba.

27.     Cuba's confiscation of the banking industry was well known to the international banking community.  The Castro Government passed multiple laws in 1960, including Cuban Laws Nos. 851 and 891, declaring banking a public function in Cuba and ordering BNC to confiscate all national and international banks in Cuba.  The foreign banks whose branches, businesses, and assets were handed over to BNC included household names like Chase and Citibank.  As part of a broad response to the Cuban Government's actions, Congress authorized the Foreign Claims Settlement Commission of the United States—a quasi-judicial, independent agency within the Department of Justice that adjudicates claims against foreign governments—to consider claims relating to Cuba's confiscation of property.  In public decisions, the Commission has granted relief for claims arising from the Cuban Government's nationalization and confiscation of banks.

28.     At the time BNC absorbed Banco Pujol, Banco Pujol had a book value in excess of $1 million and a significantly higher fair market value.  Banco Pujol also had $6.4 million on deposit with BNC that was also confiscated.  About 1.3% of BNC's equity was derived from property seized from Banco Pujol.

29.     The owners of Banco Pujol at the time—Juan M. Pujol Balmaseda, Laureano Pujol Izquierdo, Arcadio Joaquin Pujol Izquierdo, Dulce Maria Pujol Izquierdo, and Raúl Pujol Izquierdo—received no compensation for the banking enterprise that the Cuban Government confiscated and merged into BNC.  Nor did the Cuban Government later compensate anyone who held any interest in Banco Pujol for BNC's use of Banco Pujol and its assets from 1960 to the present.  Plaintiffs' lawsuit seeks recovery for Defendants' trafficking in this confiscated property, without Plaintiffs' consent, as authorized under Helms-Burton.

**II.     The Pujol Family Relocates to the United States**

30.     Owners Juan M. Pujol Balmaseda, Arcadio Joaquin Pujol Izquierdo, Laureano Pujol Izquierdo, Dulce Maria Pujol Izquierdo, and Raúl Pujol Izquierdo fled to the United States. Each Owner, and/or their respective heirs, became naturalized United States citizens before March 12, 1996:

a.      Owner Juan M. Pujol Balmaseda died a United States citizen in 1984, leaving his entire interest in Banco Pujol to his heirs Nieves Pujol, a/k/a Nieves Moreira Martinez (deceased), Juan B. Pujol Moreira, and Maria Julia Pujol Moreira.  All three heirs were United States citizens before March 12, 1996.

b.      Owner Arcadio Joaquin Pujol Izquierdo died a United States citizen in 2003.  He had become a United States citizen before March 12, 1996.

c.      Owner Laureano Pujol Izquierdo died a United States citizen in 1979, leaving his entire interest in Banco Pujol to his heirs Laureano Pujol Rojas (deceased) and Luis R. Pujol Rojas. Both heirs were United States citizens before March 12, 1996.

d. Owner Dulce Maria Pujol Izquierdo died a United States citizen in 1973, leaving her entire interest in Banco Pujol to her heirs Ana H. Fraga and Lorenzo Pérez Pujol. Both heirs were United States citizens before March 12, 1996.

e. Owner Raúl Pujol Izquierdo died a United States citizen in 1985, leaving his entire interest in Banco Pujol to his heirs Francisco Pujol Meneses, Pilar M. Pujol Meneses, and Raúl Pujol Meneses. All three heirs were United States citizens before March 12, 1996.

## III. Congress Enacts the Economic Embargo of Cuba and Helms-Burton

31. After Castro's rise to power, the United States imposed almost a complete commercial, economic, and financial embargo against Cuba. The embargo prevented (among other things) financial institutions subject to the jurisdiction of the United States from conducting business with Cuban parties or property. The embargo significantly limited Cuba's ability to access international markets.

32. In 1996, Congress sought to strengthen its embargo by adopting the Helms-Burton Act. At the time, Cuba was seeking to circumvent the embargo by using "confiscated" property to raise "badly needed" finances and expertise from "foreign investors."

33. "To deter" this "trafficking in wrongfully confiscated property," Helms-Burton provides United States nationals who were the victims of these confiscations "a judicial remedy in the courts of the United States" that "den[ies] traffickers any profits from economically exploiting Castro's wrongful seizures."

34. Title III of Helms-Burton provides that any person who traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable for monetary damages to the United States national who owns a claim to that property. "United States national" means any United States citizen or any other legal entity organized under the laws of the United

States, or of any State.  "Traffick[ing]" is defined broadly.  It includes possessing, controlling, managing, using, or holding an interest in confiscated property without the owner's consent.  It also includes "engag[ing]" in "commercial activity using or otherwise benefiting from confiscated property" without the owner's consent.  Persons who "cause[ ]," "direct[ ]," "participate[ ] in," or "profit[ ] from" trafficking by another party without the owner's consent engage in trafficking as well.

**IV.    Defendants' Trafficking in Confiscated Property in Violation of Helms-Burton**

35.    Both SocGen and Paribas violate Helms-Burton through extensive, secret financial transactions with and through BNC.  Their conduct initially came to light through government investigations and criminal proceedings brought by the United States Department of Justice.  Paribas pleaded guilty to conspiracy to violate the International Economic Powers Act and the Trading with the Enemy Act.  SocGen entered into a Deferred Prosecution Agreement ("DPA") after being charged with violating the Trading with the Enemy Act.  Both the Paribas plea agreement and the SocGen DPA include extensive stipulated statements of facts in which Defendants admit to conduct that constitutes trafficking in violation of Helms-Burton.

36.    Defendants did not abandon their dealings with BNC after entering into the DPA and plea agreement.  To the contrary, Defendants continue to engage in transactions with BNC that constitute trafficking in violation of Helms-Burton.  That ongoing conduct includes engaging in commercial activity with BNC, which has included and benefitted from the wrongfully confiscated assets of Banco Pujol since 1960.

**A.  SocGen's Trafficking**

37.    The U.S. economic embargo of Cuba restricts access to U.S. dollars important for transacting business in international markets.  U.S. law restricts, for example, BNC's ability to use

the U.S. financial system to conduct business in dollars—either to promote its own interests or to serve clients—by limiting U.S. banks' ability to process transactions involving BNC.  For that reason, most "[f]inancial institutions in the United States that process U.S. dollar transactions from other countries utilize sophisticated filters designed to identify and block or reject any transactions involving entities that have been sanctioned by [the Office of Foreign Asset Control]," including BNC.[7]  To evade those restrictions and avoid having critical transactions blocked, BNC obtained assistance from SocGen.  As SocGen admitted in a deferred prosecution agreement, since at least 2004, it has unlawfully provided "a Cuban government bank" (*i.e.*, BNC) and other Cuban entities access to U.S. dollars and the U.S. financial system.

38.    After obtaining a license to conduct "for-profit [banking] activities" in Cuba,[8] SocGen opened at least twenty credit facilities for or involving Cuban entities in U.S. dollars.  Six of those facilities involved loans directly to BNC or "loans to a New Jersey-incorporated entity for subsequent transfer to" BNC.[9]  Other facilities involved loans to finance a Cuban corporation's purchase of oil, to support the state-owned company that operates Cuba's airlines, and to finance the production and export of Cuban commodities.[10]  For example, SocGen, working with another French bank, provided a $40 million revolving line of credit to finance the importation of crude oil from the Netherlands by Union CubaPetróleo (a Cuban Government-owned corporation).[11] Those credit facilities allowed Cuban entities subject to sanctions to access U.S. dollars and

---

[7] *SocGen DPA*, Statement of Facts ¶ 11.
[8] *See* Gaceta Oficial, December 11, 1995, Resolution Number 329 of 1995, attached hereto as **Exhibit 4**.
[9] *SocGen DPA*, Statement of Facts ¶ 23.
[10] *Id.* ¶¶ 21-23.
[11] *Id.* ¶¶ 22-23.

transact business with foreign corporations that they otherwise would have been unable to do.  On information and belief, BNC was involved in the SocGen credit facilities.

39.     As part of maintaining the credit facilities, SocGen processed at least 2,500 transactions—valued at $13 billion—through New York financial institutions.[12]   SocGen, however, concealed those transactions from U.S. regulators.  For example, in January 2006, SocGen directed another bank to route payments for a Cuban credit facility through SocGen's New York branch "'without including any mention or reference to Cuba, any Cuban entity or to the Caribbean, either in the correspondence (electronic, paper or fax), the SWIFT messages or the fund transfer SWIFTS.'"[13]  Similarly, in July 2002, SocGen described the measures it would take to conceal that the credit facilities were for Cuban entities:

> We are going to receive transfer orders in USD in favor of certain suppliers in non-Cuban banks.  In this case, the USD transfer must not in any case mention the name of the [the joint venture] or its country of origin, Cuba.  The clearing will indeed be carried out in NY.  I have explicitly asked [the joint venture] to write on its transfer request the instructions to be included.[14]

40.     In late August or early September 2019, shortly after the Kozyak Tropin & Throckmorton law firm filed a Helms-Burton lawsuit against SocGen for trafficking in another confiscated bank through its activities with BNC, a Paris-based SocGen employee contacted the Kozyak Tropin & Throckmorton law firm and described SocGen's ongoing commercial activities in Cuba.  The whistleblower was responsible for managing sovereign risk, and previously helped create SocGen's "Cover Procedures," which were used to conceal U.S. dollar-denominated transactions with BNC.  The whistleblower reported that SocGen continues to derive profits from the bank's commercial activities in Cuba.  Those activities include providing Cuban entities access

---

[12] *Id.* ¶ 12.
[13] *Id.* ¶ 36 (emphasis omitted).
[14] *Id.* ¶ 15 (emphasis omitted) (alterations in original).

to foreign currency needed to transact business internationally and transact on international markets.  Upon information and belief, that foreign currency flows through BNC, which is the primary financial institution with whom foreign companies do business in or with Cuba.

41.   SocGen earns significant profits from its Cuban operations.  In a forfeiture proceeding, SocGen agreed to pay over $880 million in forfeited profits based on its illegal dealings with Cuban entities like BNC.[15]

42.   SocGen's conduct constitutes trafficking in confiscated property under Helms-Burton.  In violation of Helms-Burton, SocGen knowingly and intentionally "participates in" and "profits from" BNC's trafficking in confiscated property.  BNC traffics in confiscated property by knowingly and intentionally "manag[ing]," "possess[ing]," "obtain[ing] control of" or "otherwise acquir[ing] or hold[ing] an interest in" the banking enterprise confiscated from the Owners, and "us[ing]" Banco Pujol's property (including its banking infrastructure and equity) in its own banking operations.  BNC also engages in commercial banking that "use[s] or otherwise benefit[s] from" that confiscated property.  That BNC engages in conduct constituting trafficking in confiscated property is well known to the international banking community.  SocGen nonetheless has assisted and continues to assist BNC's banking activities.  Acting as an intermediary, at least until 2010, SocGen provided U.S.-dollar credit facilities to BNC and other Cuban entities that BNC by itself could not provide or access.  And SocGen continued, through at least late August or early September 2019, to provide the Cuban government—and, upon information and belief, BNC—access to U.S. dollars and other foreign currency that Cuba and its primary commercial banking arm (BNC) could not themselves access or provide to BNC's clients.  Only through access to that foreign currency can BNC continue to fully exploit the property it confiscated.

---

[15] *Id.* ¶ 3.

43.     SocGen also knowingly and intentionally "engage[d] in," "participate[d] in," and "profit[ed] from" "commercial activit[ies]" that "use[d] or otherwise benefit[ed]" from the confiscated property.  SocGen extended multiple credit facilities to BNC.  Those commercial activities "use[d]" property confiscated from Banco Pujol.  Those activities and SocGen also "benefit[ed] from" the confiscated property and BNC's trafficking in the confiscated property.  About 1.3% of BNC's equity was derived from property confiscated from Banco Pujol.  That confiscated property made BNC a more stable, less risky, and more desirable counterparty than it otherwise would have been, potentially allowing for more substantial loans, more favorable terms, or greater profitability.

44.     Neither the Owners nor any of their heirs nor Plaintiffs ever consented to BNC's and SocGen's trafficking in the confiscated property.

**B.  Paribas' Trafficking**

45.     Paribas traffics in the confiscated property as well.  Like SocGen, Paribas "conspired with numerous Cuban banks" to evade U.S. economic sanctions that restrict BNC's (and other sanctioned entities') access to U.S. dollars important to transacting in international markets.[16]

46.     As admitted in its plea agreement, from at least 2000 to 2010, Paribas offered U.S.-dollar financing to Cuban entities.  Most of that financing was provided through eight credit facilities operated with the involvement of Cuban banks.[17]  Through those facilities, Paribas processed more than $1.747 billion in U.S. dollar-denominated transactions.[18]  Paribas also opened

---

[16] *See* Paribas Guilty Plea, Statement of Facts ¶¶ 14, 49.
[17] *See id.* ¶ 52.
[18] *See id.* ¶ 49.

U.S.-dollar accounts with Cuban banks to permit them access to U.S. dollars.[19]  On information and belief, one of the Cuban banks or Specially Designated Nationals sanctioned entities that Paribas assisted was BNC.

47.     On information and belief, Paribas has also participated with SocGen in operating at least one of the credit facilities described above.  Paribas, like SocGen, participated in that credit facility to finance a Cuban entity's purchase of oil in U.S. dollars from the Netherlands.[20]  As part of a "highly complicated" scheme to conceal that the transactions involved a Cuban entity, Paribas would make a number of bank-to-bank transfers.[21]  One of the transfers was between a Paribas account set up at SocGen[22] and Paribas' own internal accounts.[23]  "[T]ypically," the payments would be transferred through Paribas' New York branch.[24]

48.     The plea agreement makes clear that Paribas did not abandon the credit facilities after 2010.  To the contrary, according to the plea agreement, Paribas ultimately converted a number of the remaining credit facilities into Euro-denominated credit facilities.[25]

49.     In addition to extending U.S.-dollar credit facilities to BNC and providing U.S.-dollar-denominated accounts, Paribas has provided BNC with physical U.S. dollars.  According to a former Paribas compliance officer, Paribas routinely provides to BNC in Switzerland parcels of

---

[19] *See id.* ¶ 65.

[20] *See id.* ¶¶ 52-53.

[21] *See id.* ¶ 53.

[22] SocGen is referred to as "French Bank 1" in the Paribas plea agreement.  *See id.*  Paribas, by contrast, appears to be "French Bank 1" in the SocGen DPA.  *Compare* SocGen DPA, Statement of Facts ¶ 22 (SocGen worked with "French Bank 1" on a credit facility to "finance" a "Dutch [c]ompany" in "import[ing] . . . crude oil into Cuba to be refined and sold" there), *with* Paribas Guilty Plea, Statement of Facts ¶ 52 (Paribas participated in a credit facility involving "loans to a Dutch company to finance the purchase of crude oil products to be refined in and sold to Cuba").

[23] *See* Paribas Guilty Plea, Statement of Facts ¶ 53.

[24] *See id.*

[25] *Id*. ¶¶ 66-70.

17

U.S. currency.  The former compliance officer knows U.S. currency was provided to BNC in 2020 and has no reason to believe Paribas stopped.  Upon information and belief, BNC uses the U.S. currency provided by Paribas to continue to access international markets and conduct transactions, including on behalf of its clients, that it would not otherwise be able to access or conduct.

50.     Paribas, too, has gone to great lengths to conceal its illicit activities with Cuba.  For example, in an April 2000 credit application, Paribas acknowledged the "'risk linked to the American embargo' and explained that the risk had been 'resolved' through the use of a 'fronting' structure that layered the U.S. dollar transactions using accounts at a different French bank . . . and concealed the involvement of Cuban entities."[26]  Similarly, in January 2006, a Paribas employee wrote:  "'I think we need to point out to [French Bank 1] that they should not mention CUBA in their transfer order.'"[27]  Another employee responded that French Bank 1 "'knows very well that Cuba or any other Cuban theme must not be mentioned in the transfer orders and I reminded them about this over the phone this morning.'"[28]

51.     More recently—in fact, just two days after Plaintiffs requested an extension of time to file an amended complaint in this matter because "additional time [was] required to finish investigating . . . the relationships between [Paribas] and Banco Nacional de Cuba"—a Paribas email was sent to mid-level Paribas staff warning them not to disclose information about Paribas's operations.  According to the former Paribas compliance officer, the email referenced the fine Paribas had paid in connection with the U.S.-dollar credit facilities Paribas had extended to BNC and instructed employees to report any attempts to obtain information.

---

[26] *See id*. ¶¶ 53-54.
[27] *See id*. ¶ 54 (alteration in original).
[28] *Id*.

52.     Paribas earns significant profits from its conduct, so much so that high-level managers dismissed "explicit concerns from compliance personnel" in pursuit of the profits associated with the credit facilities.[29]

53.     Paribas' conduct constitutes trafficking in confiscated property under Helms-Burton.  In violation of Helms-Burton, Paribas knowingly and intentionally "participates in" and "profits from" BNC's trafficking in confiscated property.  BNC traffics in confiscated property by knowingly and intentionally "manag[ing]," "possess[ing]," "obtain[ing] control of" or "otherwise acquir[ing] or hold[ing] an interest in" the banking enterprise confiscated from the Owners, and "us[ing]" Banco Pujol's property (including its banking infrastructure and equity) in its own banking operations.  BNC also engages in commercial banking that "use[s] or otherwise benefit[s] from" that confiscated property.  That BNC engages in conduct that constitutes trafficking in confiscated property is well known to the international banking community.  Paribas nonetheless assists BNC's banking activities, including after being notified it was trafficking in confiscated property.  Acting as an intermediary, Paribas provided U.S.-dollar credit facilities to BNC and other Cuban entities that BNC by itself could not provide or access.  Through at least 2020, Paribas also provided physical U.S. dollars to BNC that BNC needs to operate as a commercial bank but could not itself access or provide to its clients.  Only through access to that foreign currency can BNC continue to fully exploit the property it confiscated.

54.     Paribas also knowingly and intentionally "engage[d] in," "participate[d] in," and "profit[ed] from" "commercial activit[ies]" that "use[d] or otherwise benefit[ed]" from the confiscated property.  Paribas extended multiple credit facilities to BNC.  Those commercial activities "use[d]" property confiscated from Banco Pujol.  Those activities and Paribas also

---

[29] *Id*. ¶ 51.

"benefit[ed] from" the confiscated property and BNC's trafficking in the confiscated property. About 1.3% of BNC's equity was derived from property confiscated from Banco Pujol. That confiscated property made BNC a more stable, less risky, and more desirable counterparty than it otherwise would have been, potentially allowing for more substantial loans, more favorable terms, or greater profitability.

55.    Neither the Owners nor their heirs nor Plaintiffs ever consented to BNC's and Paribas' trafficking in the confiscated property.

## V.    Paribas' Additional Ties to Cuba

56.    Beyond the conduct identified above, Paribas' connections to the Cuban government and to business dealings with Cuban enterprises are extensive and continuing. Those include, but are not limited to, the following.

a.    According to the former Paribas compliance officer and another source, a German company banking with Paribas has extensive business dealings with the Cuban government-owned airline, Cubana de Aviación, and BNC. For example, the German company makes payments into a BNC account for the purchase of fuel from Cubana de Aviación. Those payments continued through at least early 2020.

b.    According to the former Paribas compliance officer, in February 2018, Paribas advanced money to a French company that, one month later, sold locomotives and rolling stock to Cuba. The loan was still being repaid in early 2020.

c.    According to the former Paribas compliance officer, a Paribas subsidiary has repeatedly invested in Melbana Energy since September 2018 and remained invested through at least February 2020. The investment provided capital that partly enabled Melbana to sign contracts with the state-affiliated Cuban steelmaker Antillana de Acero. Melbana is also exploring for oil in Cuba.

d.    According to the former Paribas compliance officer, through at least December 2018, Paribas provided banking services to RaFin, S.A., an investment firm controlled by the Cuban military.

Upon information and belief, BNC is involved in at least some of the transactions because it is the primary financial institution with whom foreign companies do business in or with Cuba.

## ALLEGATIONS AS TO DAMAGES

57.     Helms-Burton provides statutory measures of compensatory and treble damages that Plaintiffs demand in these proceedings, along with attorneys' fees and costs.

58.     Plaintiffs are entitled to compensatory damages equaling the fair market value of Plaintiffs' property.  That valuation is either the current value of the property or the value of the property when confiscated in 1960, plus interest, whichever is greater.

59.     Treble damages are also warranted.  Pursuant to 22 U.S.C. § 6082(a)(3)(D), Plaintiffs, non-certified claimholders—on behalf of the holders of interests in Banco Pujol— notified SocGen and Paribas by certified mail that they were trafficking in confiscated property and demanded that they cease.  Plaintiffs also stated their intent to commence an action under Title III of Helms-Burton.  The correspondence contained the statutory summary statement required by 22 U.S.C. § 6082(a)(3)(D)(iii)(III).

60.     SocGen received Plaintiffs' demand letter on August 24, 2020.  But that was not the first time SocGen received notice that it was trafficking in confiscated property through its dealings with BNC.  Indeed, in June 2019, SocGen received a similar demand letter informing it that its actions constituted trafficking in the confiscated property of another Cuban bank.

61.     Paribas received Plaintiffs' demand letter on February 21, 2020.

62.     Neither Defendant has ever denied that they are continuing to traffic in Plaintiffs' property.

63.     Indeed, SocGen and Paribas do continue to traffic in Plaintiffs' property.  Both Defendants continue to operate similar credit facilities to the ones described above, except those facilities exclude U.S.-dollar transactions to avoid U.S. law.  In the 2000s, SocGen and Paribas began to transition a number of the credit facilities described above from using U.S. dollars to

using other currencies.[30]  A SocGen employee confirmed that SocGen continued, through at least late August or early September 2019, to provide the Cuban government—and, upon information and belief, BNC—access to foreign currency that BNC could not itself access or provide to its clients.  And a former Paribas compliance officer confirmed that, through at least 2020, Paribas provided BNC access to U.S. dollars by another means—physical deliveries of currency.  Those activities all had a common effect:  They provided BNC with access to foreign currency that BNC needed to access international markets, conduct transactions in foreign currency, and allow its clients to do the same.

64.     Neither Defendant represented that it would cease extending credit facilities to BNC, providing BNC with access to U.S. dollars, or otherwise trafficking in confiscated property in response to demand letters.

65.     BNC's website, copyrighted 2020, confirms that it is continuing to engage in transactions with French banks.  It explains that BNC deals in "credits" and other financial instruments in "foreign currencies"; "record[s], control[s], service[s], and handle[s]" "foreign debt"; "handl[es] . . . financial operations related to foreign trade"; "manag[es] foreign financing"; and "keep[s] . . . strict record and control of Cuba's foreign debt and its own, as well as debt servicing and attending through cessions and transactions, any renegotiations derived or required from it."[31]  BNC also claims to have an active "Representative Office" in Paris, France, with the specific purposes of paying "especial attention to relations with central and commercial Banks"

---

[30] *See* SocGen DPA, Statement of Facts ¶ 33; Paribas Guilty Plea, Statement of Facts ¶ 66.
[31] Banco Nacional de Cuba, About Us, http://www.bnc.cu/about-us/ (last visited Feb. 4, 2022).

and other "operations with institutions" in France, as well as continuing to "explore the possibility of obtaining new financial capacities."[32]

66.　　Treble damages against the Defendants are warranted.

## TOLLING OR NON-ACCRUAL OF STATUTE OF LIMITATIONS

67.　　Each President of the United States suspended the right to sue under Helms-Burton from when it would have taken effect on August 1, 1996, through May 2, 2019, when the Executive Branch lifted that suspension.  To the extent that Plaintiffs' claim accrued against SocGen and Paribas during that suspension period, the Defendants' liability "can't be extinguished subsequently."[33]  The President lifted the "suspension period" on May 2, 2019, and Plaintiffs brought suit in November 2020.

68.　　For years, SocGen and Paribas knowingly and intentionally profited by trafficking in Plaintiffs' confiscated property, actively concealing their actions to prevent discovery by U.S. regulators.  The U.S. government publicly announced SocGen's DPA on November 19, 2018, and attached it to a complaint for forfeiture.[34]  Plaintiffs had no actual knowledge of SocGen's trafficking in Banco Pujol property before that date.  Nor could they have obtained such knowledge through reasonable diligence.

69.　　Finally, Defendants' trafficking is ongoing.  Defendants continue to provide BNC with U.S. dollars and other foreign currencies needed to operate and provide banking services, and thereby continue to traffic in Plaintiffs' confiscated property through dealings with BNC.

---

[32] Banco Nacional de Cuba, Representative Office, http://www.bnc.cu/paris-office/ (last visited Feb. 4, 2022).
[33] *See* Office of the Press Secretary, Briefing on Helms-Burton Title III Suspension 7/16/96, 1996 WL 396125, at *5 (July 16, 1996).
[34] *See* Exhibit 2 at 4.

## COUNT I
### Liability for Trafficking Pursuant to Helms-Burton
### (Against Both Defendants)

70.     Plaintiffs re-allege and incorporate paragraphs 1-69 above as if fully set forth herein.

71.     Plaintiffs hold interests in Banco Pujol.  Accordingly, Plaintiffs respectfully request that the Court: (1) enter a judgment against the Defendants for monetary damages in accordance with § 6082(a), including (a) the greater of the current value of the property or the fair market value of the property when confiscated plus interest, and (b) treble damages; (2) award attorneys' fees and costs in accordance with § 6082(a)(1)(A)(ii); and (3) award any further relief deemed appropriate by this Court.

## DEMAND FOR JURY TRIAL

Plaintiffs request a jury trial for any and all counts for which a trial by jury is permitted by law.

Dated: February 4, 2022                                    Respectfully submitted,

New York, New York

Javier A. Lopez, Esq.                                      /s/ Steven F. Molo
Benjamin J. Widlanski, Esq.                                Steven F. Molo
Dwayne A. Robinson, Esq.                                   Sara E. Margolis
Evan J. Stroman, Esq., CPA                                 **MOLOLAMKEN LLP**
**KOZYAK TROPIN &**                                        430 Park Ave.
**THROCKMORTON, LLP**                                      New York, New York  10022
2525 Ponce de Leon Blvd., 9th Floor                        Tel.: (212) 607-8170
Miami, Florida  33134                                      Fax: (212) 607-8161
Tel.: (305) 372-1800                                       smolo@mololamken.com
Fax: (305) 372-3508                                        smargolis@mololamken.com
jal@kttlaw.com
bwidlanski@kttlaw.com                                      James A. Barta
drobinson@kttlaw.com                                       **MOLOLAMKEN LLP**
estroman@kttlaw.com                                        600 New Hampshire Ave., N.W.
                                                           Suite 500
                                                           Washington, D.C.  20037
                                                           Tel.: (202) 556-2000
                                                           Fax: (202) 556-2001
                                                           jbarta@mololamken.com